# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Ronald Johnson,

> Plaintiff,

v.

Kristopher Kramer,[1] individually and in his
official capacity as a Minneapolis Police
Officer, Cory Fitch, individually and in his
official capacity as a Minneapolis Police
Officer, and the City of Minneapolis,

> Defendants.

**ORDER**
Civil No. 04-4097 ADM/RLE

---

David Garelick, Esq., Larry Leventhal & Associates, St. Paul, MN, appeared for and on behalf of
Plaintiff Ronald Johnson.

Ann E. Walther, Esq., Rice, Michels & Walther, LLP, Minneapolis, MN, appeared for and on
behalf of Defendants Kristopher Kramer and Cory Fitch.

C. Lynne Fundingsland, Esq., Assistant City Attorney, Minneapolis, MN, appeared for and on
behalf of Defendant City of Minneapolis.

---

# I. INTRODUCTION

On December 19, 2005, oral argument before the undersigned United States District

Judge was heard on Defendants' Motions for Summary Judgment.  Defendants Kristopher

Kramer ("Kramer") and Cory Fitch ("Fitch") jointly filed a Motion for Summary Judgment

[Docket No. 29].  Defendant City of Minneapolis ("Minneapolis") filed a separate Motion

[Docket No. 31].  In his Amended Complaint ("Complaint") [Docket No. 9], Plaintiff Ronald

Johnson ("Johnson") alleges assault and battery, intentional infliction of emotional distress,

---

[1] Both individual Defendants' names have been previously misspelled in the caption for
this case.  Here, the names have been corrected, and the caption will henceforth reflect the
correct spellings.

violations of the Minnesota Constitution, violations of the Minnesota Human Rights Act, and violations of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. In his opposition memorandum, however, Plaintiff failed to rebut Defendants' arguments for summary judgment on the Minnesota Human Rights Act count, the Minnesota Constitution count, and the Eighth and Fourteenth Amendment counts. As a result, judgment for Defendants will be entered on those counts. Additionally, for the reasons set forth herein, Defendants' Motions are granted in their entirety.

## II. BACKGROUND

Ronald Johnson is a homeless man who has lived on the streets of Minneapolis for several years. Johnson Dep. (Walther Aff. [Docket No. 35] Ex. A) at 21. Johnson has battled alcoholism for a number of years. Garelick Aff. [Docket No. 65] Ex. E. He currently receives Social Security disability payments as a result of mental deficiencies. Johnson Dep. at 8. Johnson has at least twice, while intoxicated, been transported from Nicollet Mall to the Third Avenue bridge and told to walk back by the Minneapolis Police. Id. at 72. Johnson stated he found these episodes to be "good experiences." Id. at 72-73.

On January 24, 2003, Johnson was holding a sign asking for money near the intersection of Hennepin and Lyndale Avenues. Id. at 22. After a driver handed him a $20.00 bill, he purchased a bottle of vodka and met his cousin, Flora Mitchell ("Mitchell"), and another man to drink the vodka. Id. at 23-24. The next memory Johnson has of his evening is awakening in the Hennepin County Medical Center ("HCMC"). Id. at 27.

During the evening of January 24, 2003, Minneapolis Police Officers Kramer and Fitch were patrolling the First Precinct, which covers the downtown area of Minneapolis. Kramer

Statement (Walther Aff. Ex. O) at 1-2.  At 11:30 p.m., Kramer and Fitch were dispatched to a call reporting three Native Americans drinking behind a Walgreens drug store located on Nicollet Avenue at Fourth Street.  Kramer Dep. (Walther Aff. Ex. C) at 6-7.  Upon arrival at Walgreens, Kramer and Fitch found the three individuals, who were later identified as Johnson, Mitchell, and a third male.[2]  Johnson Dep. at 24.  Kramer and Fitch concluded all three individuals were intoxicated.  Fitch Dep. (Walther Aff. Ex. D) at 12; Fitch Statement (Walther Aff. Ex. N) at 3.  The temperature was slightly above zero degrees that evening.  Fitch Dep. at 11-12.

Kramer and Fitch heard over the radio that the Detox Center had no more room for males.  Fitch Statement at 6; Kramer Statement at 6.  Kramer and Fitch failed to check to see if room existed for females.  Garelick Aff. Ex. F at 1.   One of the individuals, the source being undetermined, indicated that Johnson and Mitchell lived at Little Earth.[3]  Fitch Dep. at 15; Fitch Statement at 6; Kramer Dep. at 24; Kramer Statement at 6.  Although Johnson's grandmother lived at Little Earth in the early 1980s, Johnson had never resided there.  Johnson Dep. at 10, 14-16.  Kramer and Fitch agreed to take Johnson and Mitchell to Little Earth.  Kramer Dep. at 24.  Little Earth is approximately a five to eight minute drive from downtown Minneapolis.  The third man stated he would leave the Walgreens area on his own.  Fitch Dep. at 16; Fitch Statement at 6.  Both Johnson and Mitchell were sufficiently intoxicated to require physical assistance getting into Kramer and Fitch's squad car.  Fitch Dep. at 16.

---

[2] The third person at the scene has not been identified by the parties.

[3] Little Earth of United Tribes, also known as Ogema, is a housing project in south Minneapolis that maintains a preference for Native American tenants.

Upon arriving at Little Earth, Kramer and Fitch drove to the front office area of the complex.  Fitch Dep. at 23; Kramer Dep. at 28.  Mitchell told the officers they did not live in that area of the complex, so the officers went to the next entrance.  Id.  Again, Mitchell stated they did not live in that area of the complex, so the officers took them to the last entrance.  Fitch Dep. at 23; Kramer Dep. at 34.  Johnson and Mitchell were still sufficiently intoxicated to require help getting out of the squad car.  Fitch Statement at 10-11.  After being assisted from the squad car, Mitchell walked over to the curb.  Id. at 10.  Fitch attempted to hand Johnson his identification card back; however, Johnson did not understand what Fitch was trying to do, raising his hand and saying "no" to Fitch.  Garelick Aff. Ex. H at 11.  After explaining to Johnson that he was trying to give him his identification, Johnson accepted it from Fitch.  Id.  Johnson and Mitchell remained outside when the officers left.  The officers made no attempt to assist Johnson and Mitchell indoors.  After leaving Little Earth, the officers returned to Walgreens to find the third individual still behind the store.  The officers then took the third man, at his request, to Washington Avenue near Tenth Street.  Kramer Dep. at 44.

Within a half hour after leaving Johnson and Mitchell at Little Earth, the dispatcher at Little Earth contacted two off-duty Minneapolis Police officers, Robert Helmeke and Kelly O'Rourke, who were working for Little Earth that evening.  Helmeke Statement (Walther Aff. Ex. E) at 3.  Helmeke and O'Rourke arrived at Little Earth to find Johnson sitting in the parking lot.  Id.  Helmeke and O'Rourke contacted the Detox Center, only to learn, as Kramer and Fitch had previously, that there was no additional room.  Id. at 7.  When asked where he lived, Johnson replied only that he lived at Little Earth.  Id. at 4.  Due to the cold weather and Johnson's apparent level of intoxication, Helmeke and O'Rourke took Johnson to HCMC, arriving shortly

4

before 1:00 a.m.  Id. at 7, 10; Walther Aff. Ex. F.  A notation on Johnson's hospital record, made at 3:54 a.m., states that Johnson was brought in "after he was found down with people who passed by urinating on him."  Walther Aff. Ex. F.  A DNA test performed on the urine found on Johnson's clothes revealed that only Johnson's own urine was present.  Bode Report (Walther Aff. Ex. G).  The hospital records also indicate Johnson suffered a head injury as well as an abrasion on his right knee.  Walther Aff. Ex. F.

The Internal Affairs department of the Minneapolis Police Department investigated the events of the night of January 24, 2003.  The report found no evidence that Kramer and Fitch urinated on Johnson or assaulted him; however, the officers were reprimanded for failing to ensure that Johnson and Mitchell got inside when they were dropped off at Little Earth.  Garelick Aff. Ex. F.  At Johnson's request, former Minneapolis Police Chief Tony Bouza investigated the incident, concluding, among other things, that there was "strong evidence" that Kramer and Fitch urinated on Johnson.  Garelick Aff. Ex. J.[4]  As a result of the Internal Affairs investigation, Kramer and Fitch were suspended for one day for violation of section 5-103 of the Minneapolis Police Department code of conduct.  The report stated, in part: "With regard to 5-103, we felt it was very poor judgment to leave unquestionably intoxicated vulnerable people, outside, without confirming shelter, in extreme weather conditions."  Garelick Aff. Ex. F at 3.

**III. DISCUSSION**

---

[4] Because of Johnson's total lack of memory of the evening's events, former Chief Bouza's report contains many conclusions based upon reconstruction and assumed facts.

**A.      Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Assault and Battery**

Counts One and Two of Johnson's Complaint allege Kramer and Fitch threatened him with bodily harm, and did in fact physically harm him.  "A battery is defined as an intentional unpermitted offensive contact with another."  Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980).  "An assault is an unlawful threat to do bodily harm to another with present ability to carry the threat into effect."  Dahlin v. Fraser, 288 N.W. 851, 852 (Minn. 1939).

Here, no credible evidence has been presented to support the claims that Kramer and Fitch threatened, or committed, any violent or offensive contact on Johnson.  The only evidence that Johnson was touched by Kramer and Fitch occurred when they helped him into and out of the squad car.  Fitch Dep. at 16; Fitch Statement at 10-11.  No evidence suggests that this

6

conduct was unwelcome, or that Johnson suffered any injury or offense from these contacts with

Kramer and Fitch.  The only potentially contrary evidence presented by Johnson is the statement

of a witness, who claimed that upon arrival at Little Earth, Kramer and Fitch "both pulled out the

Indian male and tossed him out of the car and he went, you know threw him out."  Medina

Statement (Garelick Aff. Ex. R) at 2.  This statement, however, is unsigned and unsworn, and

therefore constitutes inadmissible hearsay.  Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001).

Even if Medina's statement were admissible, it is too vague to raise a genuine issue of material

fact.  Moreover, although hospital records indicate that Johnson suffered some head trauma and a

knee abrasion, no evidence has been proffered to connect these injuries to the behavior of

Kramer and Fitch.  Walther Aff. Ex. F.  Thus, this battery claim must fail.

Additionally, Johnson claims he was urinated upon by Kramer and Fitch.  Although the

notes from Johnson's hospital record mentions he was urinated on by "people who passed by,"

the result of a DNA test was that the only urine on Johnson was his own.  Walther Aff. Ex. F;

Bode Report.  Moreover, no witnesses or other evidence has been proffered by Johnson to

suggest he was urinated on by Defendants.  The only evidence presented by Johnson is his own

testimony that he heard the phrase "look at that steam rising" while at Little Earth, which led him

to the conclusion that the officers urinated on him.  Johnson Dep. at 28-31.  Consequently, the

evidence presented by Johnson is insufficient to raise a genuine dispute of material fact, and the

battery count fails.

Johnson also claims that he was assaulted when Fitch attempted to hand him his

identification card at Little Earth.  After Johnson was helped out of the squad car at Little Earth,

he threw his hands up when Fitch tried to hand him the card, until Fitch explained to Johnson

that it was his identification.  Garelick Aff. Ex. H at 11.  Although Johnson may have misinterpreted Fitch's actions, the fact that Johnson raised his hands in response to Fitch is insufficient to raise a genuine issue of material fact as to whether Johnson was assaulted.  The act of handing a person an identification card can not reasonably support an inference that the person intended to act with the requisite intent for assault.  Johnson currently has no memory of this incident.  Consequently, because Johnson has raised no issues of material fact, judgment will be entered for Defendants on Johnson's assault claim.

**C.     Intentional Infliction of Emotion Distress**

Count Three of Johnson's Complaint states a claim for intentional infliction of emotional distress.  Under Minnesota law, a case of intentional infliction of emotional distress must be proved through four distinct elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  Langeslag v. KYMN Inc., 664 N.W.2d 860, 864 (Minn. 2003).  The burden on a plaintiff in proving a case of intentional infliction of emotional distress is high: "We have cautioned that intentional infliction of emotional distress is 'sharply limited to cases involving particularly egregious facts' and that a 'high threshold standard of proof' is required to submit the claim to a jury."  Id.  Moreover, "The actor must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur."  K.A.C. v. Benson, 527 N.W.2d 553, 560 (Minn. 1995).

Johnson's claim for intentional infliction of emotional distress does not stem directly from the events of January 24, 2003.  As Johnson testified, he has virtually no recollection of the night in question.  Johnson Dep. at 27.  Rather, his alleged distress is a result of being told by

friends what they believed happened on that evening, and what they believed the Minneapolis police might do to Johnson.  Id. at 57-59.  Whether a plaintiff may maintain a claim for intentional infliction of emotional distress when the plaintiff has no memory of the events that allegedly caused the distress is doubtful.  However, that issue of causation need not be addressed here, because the undisputed material facts demonstrate that Kramer and Fitch's actions do not meet the high standard of extreme and outrageous conduct required to demonstrate a claim for intentional infliction of emotional distress.

As previously discussed, no credible evidence exists to support Johnson's assault and battery claims.  Therefore, the alleged assault and battery can not form the extreme and outrageous conduct required.  Johnson is confined to the facts of record, which are that Kramer and Fitch picked him up at Walgreens and drove him to Little Earth.  Certainly, being left outside on a cold winter night is an unpleasant and potentially dangerous experience.  However, in this instance it does not rise to the level of outrageousness that an intentional infliction of emotional distress claim requires, particularly when Johnson might have found himself in the same circumstances had the police never been summoned to Walgreens.  Finally, the only alleged physical manifestation of Johnson's emotional distress is sleeplessness, for which Johnson has not sought treatment.  Id. at 60, 64.

In sum, the lack of extreme and outrageous behavior, as well as causation issues, doom Johnson's intentional infliction of emotional distress claim.

**D.    Excessive Force and Unreasonable Search and Seizure Claim**

In Count Eight of his Complaint, Johnson claims violation of his Fourth and Fourteenth Amendment rights through a 42 U.S.C. § 1983 excessive force claim.  Additionally, Johnson alleges Kramer and Fitch violated his Fourth Amendment right to be free from unreasonable seizures.  The use of force during an arrest implicates the Fourth Amendment right to be free from unreasonable seizures.  Graham v. Connor, 490 U.S. 386, 394 (1989).  The force employed by officers effectuating an arrest must, given the circumstances of the arrest, be objectively reasonable.  Wilson v. City of Des Moines, Iowa, 293 F.3d 447, 451 (8th Cir. 2002) (citing Graham, 490 U.S. at 397).  However, not all force used by police officers is violative of the Constitution.  McVay v. Sisters of Mercy Health Sys., 399 F.3d 904, 909 (8th Cir. 2005).  The Fourth Amendment also protects individuals from unreasonable arrests.  "No right is more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."  Terry v. Ohio, 392 U.S. 1, 9 (1968) (citation omitted).

As a threshold matter, Johnson was not unreasonably seized.  Although Johnson claims he was the victim of an unreasonable seizure in his Complaint, no evidence has been presented that he was arrested or put into custody on the night of January 24, 2003.  In fact, the undisputed facts demonstrate that Johnson willingly went with the Kramer and Fitch when they offered him a ride to Little Earth.  Moreover, Johnson argues in his own opposition memorandum that he was not put under arrest that evening.  Pl's Mem. in Opp. to Defs' Motions for Summ. J. [Docket No. 63] at 9; Kramer Dep. at 22.  Consequently, Johnson's unreasonable seizure claim fails.

As previously discussed, Johnson has not presented any credible evidence demonstrating that Kramer or Fitch physically battered or otherwise harmed him. This same analysis is relevant to Johnson's excessive force claim. The undisputed facts demonstrate that Kramer and Fitch helped Johnson into and out of their squad car. However, only the slimmest of evidence, in the form of an inadmissible statement of a third party, has been presented by Johnson to refute this version of events. As a result, Johnson's excessive force claim must fail.

Johnson also relies on Wood v. Ostrander to demonstrate that he has set forth a substantive due process claim. 879 F.2d 583 (9th Cir. 1989). In Wood, the plaintiff was a passenger in a vehicle when the driver was cited for driving while intoxicated. Id. at 586. The state trooper impounded the vehicle and left the passenger to find her way home in an area known for high crime. Id. Ultimately, the passenger accepted a ride from a stranger, who raped her. Id. The Ninth Circuit found that the trooper acted with deliberate indifference to the plaintiff's welfare. Id. at 588. The facts in this case, however, do not rise to the level of severity presented in Wood. As Kramer and Fitch argue, they did not create a dangerous situation for Johnson. The danger to Johnson was that of exposure; had Kramer and Fitch left Johnson at Walgreens, he would not have been in any more danger than being left near an entrance at Little Earth. Additionally, Kramer and Fitch reasonably believed that Johnson resided at Little Earth. Further supporting this contention is the fact that when Officers Helmeke and O'Rourke arrived at Little Earth, Johnson claimed that he lived there. Helmeke Statement at 3. Because the evidence in this case is insufficient to demonstrate that Kramer and Fitch acted with deliberate indifference to Johnson's safety, Johnson's substantive due process claim can not survive.

11

Finally, even if Johnson could raise genuine issues of material fact as to his Constitutional claims, Kramer and Fitch are subject to qualified immunity. "Qualified immunity shields government officials from liability in civil lawsuits when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" K.D. v. County of Crow Wing, No. 05-2499, 2006 WL 119876, at *3 (8th Cir. Jan. 18, 2006) (citation omitted). Here, Johnson has not identified a clearly established right which has been violated. Although Johnson repeatedly references Minn. Stat. § 253B.05, subd. 2, this statute does not set forth a right which was violated. The statute states, in relevant part:

> A peace or health officer or a person working under such officer's supervision, may take a person who is believed to be chemically dependent or is intoxicated in public into custody and transport the person to a treatment facility. If the person is intoxicated in public or is believed to be chemically dependent and is not in danger of causing self-harm or harm to any person or property, the peace or health officer may transport the person home.

Minn. Stat. § 253B.05, subd. 2. This statute gives discretion to police officers to determine whether to transport an individual to a treatment facility, or merely transport the individual home. Because the Court can not discern that any clearly established right of Johnson was violated, qualified immunity applies to Kramer and Fitch.

**E.     Negligence Claims**

Count Seven of Johnson's Complaint states claims for negligence against the City of Minneapolis. Minn. Stat. § 466.02 states that municipalities can be held responsible for the torts of its employees. However, Minn. Stat. § 466.03, subd. 6 excepts claims based upon the performance or the lack of performance of a discretionary function. This exception is "intended to prevent judicial review, through the medium of a tort action, of executive and legislative policy-making decisions." Fear v. Indep. Sch. Dist. 911, 634 N.W.2d 204, 210 (Minn. Ct. App.

2001) (citation omitted).  "Hiring, supervising, training, and retaining municipal employees are policy-level activities that are protected by statutory immunity."  Id. at 212.  This includes the hiring, supervising, and retaining of police officers.  Maras v. City of Brainerd, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993).  Because Minnesota law is clear that municipalities are shielded from the type of negligence claims advanced by Johnson under the doctrine of statutory immunity, judgment will be entered for Minneapolis on this count.

## F.    Monell Claim

Finally, Johnson brings a Monell claim against Minneapolis.  As a general matter, municipalities are not subject to respondeat superior or vicarious liability under § 1983.  Monell v. Dept. of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978).  However, a municipality can be held liable for its own wrongs when the enforcement of a policy or practice of the municipality results in the deprivation of federally protected rights.  Id. at 694.  To demonstrate Minneapolis' liability under a Monell claim, the Plaintiff must show that a policy or custom of Minneapolis was the "moving force [behind] the constitutional violation."  Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted).

Johnson relies on the testimony of both Officers Kramer and Fitch for the proposition that a custom exists in Minneapolis of transporting intoxicated people around the city and then abandoning them to the elements.  This conclusion, however, is overly broad, based on the context of Kramer and Fitch's testimony.  Their testimony indicates that, on occasion, they would transport intoxicated people to their homes or other locations of their choosing.  It does not suggest Minneapolis police officers are picking up inebriated individuals and dropping them off at random points in the city.  In a vacuum, this custom is not indicative of a constitutional

violation; in fact, Minn. Stat. § 253B.05, subd. 2 expressly gives police the discretion to return intoxicated persons to their home.  However, even if Kramer and Fitch's testimony were sufficient to establish the custom alleged by Johnson, his <u>Monell</u> claim must fail because he has failed to establish a constitutional violation that occurred as a result of the custom.  Therefore, judgment will be entered for Minneapolis.

## IV. CONCLUSION

For the reasons stated on the record, and based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendants Kristopher Kramer and Cory Fitch's Motion for Summary Judgment [Docket No. 29] is **GRANTED**; and

2.  Defendant City of Minneapolis' Motion for Summary Judgment [Docket No. 31] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


BY THE COURT:


        s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  February 13, 2006.

14